Good morning, Your Honors. My name is McChristy Adams. I'm here on behalf of the appellants today. The San Pedro River is drying up. The river is being sucked dry by the surrounding development, and this development is being fueled by three federal agencies. Now, the key issue in this case is that the development is there, so what the agencies do, if I understand it right, is to guarantee loans, either for single home purchases or for businesses, right? That's correct. So if the agency doesn't guarantee loans, there's no guarantee that the development won't be just as full and bustling as it otherwise would be? There's no question that development is likely in the Sierra Vista watershed, whether or not these agencies help guarantee loans. It's just a bit exaggerated to say that HUD and SBA and VA, through their loan program, are sucking water out of the San Pedro River. Well, the problem here is that the agencies are adding to the development in the area. They are taking actions that adding to it. They're guaranteeing loans for people who otherwise couldn't afford to buy in there. But that doesn't mean that somebody could afford to buy in there, wouldn't. Well, the agencies believe that they are encouraging development in the area, and they talk about that that is, in fact, the effect of their actions in the area. They are fueling some new development that may not happen otherwise. And every additional home, small business in that watershed has to pump groundwater, and that groundwater affects the San Pedro River. And this Court has been very clear that under, for example, the National Environmental Policy Act, even though when an agency takes an action that's intended to have an effect and does have a growth-inducing effect, they must look at those effects, even if other actions are going on at the same time that also have a growth-inducing effect. Let me ask you, do you think that you could sue a bank that was loaning to businesses and to homeowners in that area? I think it depends on the circumstances. If the intent of the loan was to go to construction, that wouldn't happen otherwise. Well, it's just like this. It's either a remodel or a construction loan. So they just substitute a bank for the government. Well, I assume it would be a Federal action in there, not a Federal sort of bank loan. If they are taking an action in that particular watershed that would make some development possible that would not happen otherwise, then, yes, the courts have been clear that a Federal agency is responsible for those effects. That's sort of the... One of the foundations here is this causal link. And it seems to me that causal link, whether it's a government agency or you had it in the private context, you still have this same kind of remoteness or speculation. So let's just say it's a community bank that's trying to promote development in the area. And you're not, your organization isn't restricted to suing the Federal government, although that usually is in the context in which we see the organization. Why wouldn't you sue all the lenders in the area? Well, NEPA and the Endangered Species Act apply to Federal agencies. And so that's why I was drawing that distinction. The purpose of NEPA and ESA is so that agencies kind of take a step back. And no matter what action they're taking, if it has some sort of effect, even though it might be later in time, both the ESA and NEPA account for a causation chain that could be, you know, the effect doesn't have to be we do A and B happens. There's the regulations contemplate a situation where we do A and, you know, B and C are likely to happen later in time. And the purpose of these statutes is that the agencies take a step back, consider what kind of effects they're having, and decide whether or not they're going to change the way they do their actions. This is probably a really stupid question, but what do you see the action as? I don't believe that's a stupid question at all. We challenged, it's slightly different between NEPA and the ESA. We challenged a series of individual specific loan insurance actions in this watershed under NEPA. They're identified in the second amended complaint. Those are the individual loan grants. That's correct. That's the action. I give, you know, VA or whomever, I give a loan to an individual homeowner. Well, I'm sorry, the VA gives the guarantee. Guarantee of the loan. Right. The bank is usually the one who does the loan itself. Individual by individual? Individual, yes. Really? Did I misunderstand your question? I'm sorry. No. So they're taking a series of these individual actions, hundreds, in the VA's case thousands of these actions, in this one watershed over the course of several years. And for NEPA purposes, the agency has to think about these actions in a collective sense. It can't continue to do a series of individual actions without evaluating the cumulative effects of its actions. Now, the actions in the ESA context are slightly broader because the ESA allows us to challenge both the individual actions and the program itself sort of as a whole. Do you have any cases in which just extending a loan causes federal action for purposes of endangered species or NEPA? Well, yes, under both, actually. Well, loan insurance. The two cases that we cited with FEMA, which does very much what HUD, VA, and SBA are doing here, FEMA issues flood insurance for development in floodplains. This is development that probably couldn't get insurance otherwise, so it's growth or development that wouldn't happen otherwise. And in these two cases, the flood insurance in the particular geographic areas was affecting or might affect endangered species, and so both courts found that because FEMA was issuing the flood insurance, that flood insurance was likely to lead to development, and that development was likely to affect species. The agencies had to consult and think about those effects before it went forward in those two geographic areas. And similarly, in the NEPA context, there's not, you know, HUD has complied with NEPA over and over across the country in terms of its loan insurance and loans itself, and we cited those cases in the brief. There's no difference here between or no practical difference between doing a NEPA analysis on one particular project that has, you know, several hundred apartments or something like that versus doing a NEPA analysis in the Sierra Vista watershed where there's individual homes but a series of them that adds up to the same significant effects. What have, in the statutory scheme for these agencies, where is it you see this leeway for them to in effect write in restrictions or take consideration of these issues? Well, all three agencies have that discretion. For example, under the Endangered Species Act, the ESA is intended to apply to every single federal agency, whether or not it already has a wildlife or environmental mandate. And so the standard under the ESA is whether the statute prohibits them from considering wildlife or species. So in a situation where a statute says you can consider these number of criteria and nothing else, that would make it impossible for the agency to add those terms and conditions. But here there's nothing that does that. It's the absence of any restriction that gives them permission, in other words. Well, in this circumstance it's both. There's the absence of a prohibition, and each agency statute specifically say the secretary or the administrator may add terms and conditions. But it seems to me when you read the statute that does give some discretion to add considerations that those considerations in each instance have to do with processing of the loan or financing considerations. Well, that's not unexpected. The agency's enabling statutes would naturally deal with those financial considerations because that's the mandate of these statutes. But the purpose of the ESA is to inject species protection into statutes, into agencies' actions that aren't already thinking about species protection. Could you tell us how this would work as a practical matter in terms of you're considering a loan guarantee for an individual versus a big project? So would that trigger the consultation duty, an individual loan guarantee under the ESA? Under the ESA. Well, the agency could do it either way. It would be up to the agency the way to do it. The agency could do a programmatic consultation for the Sierra Vista watershed and determine whether it needs to change its criteria for future loans or it could do a consultation on each loan. Obviously, it probably makes more practical sense to do a programmatic sort of consultation. But it's forward-looking. The agency would do the consultation, consider whether or not it needs to change the way it's doing its business, and then change those criteria if it deems it necessary. One other thing I wanted to address to your question, Judge Reimer, is that from the Supreme Court and decades of case law, there's been a consistent point that the ESA must apply to every federal agency, even though the agency statute has nothing to do with wildlife protection. And, for example, in NRDC versus Houston, in this court, the Bureau of Reclamation's discretion in their ability to change their water contracts just came because the water contract said you must base the negotiations based on the availability of water. But that wasn't to protect species. The Bureau of Reclamation's purpose was, in fact, to do irrigation. But because ESA applies to every agency, when there's any discretion in there, the agency can use that discretion if it's necessary, if it chooses to do so, to protect species. And here, that's exactly what the agency can do. Thank you. I'd like to reserve the remainder of my time for rebuttal. Thank you. Sure. Mr. Shilton. May it please the Court, I am David Shilton, representing the Departments of Housing, Urban Development, Veterans Affairs, and Small Business Administration. We actually think that these claims are subject to three independent legal faults, two of which were relied upon by the district court, one which wasn't, but I think it's important I want to mention it. We think that these claims are improper programmatic attacks. Under neither statute can an organization assert claims that are not focused on particular agency actions, but instead group together a large number of agency actions that plaintiffs characterize as a program, as they have here. So that's our first point. Our second point is that neither statute applies in the absence of at least some causal link between the agency action and the environmental harm, and we think there was no link here. And the third is that under neither statute neither applies where the agency does not have discretion to do something about that environmental effect if it has caused such an effect. Now, our argument about the programmatic nature of this action is simply this. In order to create a large enough effect, plaintiffs have lumped together a large number of actions and activities by three different agencies, and the courts I think have made clear that that's not a way that you can proceed. This is clearest certainly under the National Environmental Policy Act, because there we have the precedent of National Wildlife Federation v. Lujan from the Supreme Court, which says that a plaintiff under a NEPA case has to proceed under the Administrative Procedure Act and must point to a final agency action that injures the plaintiff that is ripe for review and then explain why that final agency action is arbitrary and capricious. That's the model the courts use. And plaintiffs have clearly not done that. Their complaint lists a number of examples of agency actions, but those are simply submitted as examples. They're not what the plaintiff is asking the court to review. There's been no showing that those particular loan guarantees cause any injury. What do you view as the agency action that is an issue? I think what plaintiffs are trying to say here is that there is a program that each agency has with respect to the Sierra Vista area of Arizona. But, in fact, there is not. None of these agencies have a program in the Sierra Vista area. They may have a national program of providing loan guarantees, but that is not what plaintiffs are challenging in this lawsuit. So I think the point of cases like National Wildlife Federation is that the plaintiff can't themselves define an agency program and say that's what the agency has to comply with the statute with regards to. They've got to focus on particular agency actions. Does that relate more to their NEPA claim than to the ESA, however? It is clear with regard to NEPA because they have to proceed under the APA. But I think it is also true with respect to the Endangered Species Act. Under the Endangered Species Act, they proceed under a citizen supervision, which says that you can ask a court to enjoin any person, including an agency, that's in violation of a provision of the statute. The provision here is Section 7A2, but 7A2 only applies to actions authorized, carried out, or funded by a Federal agency that are likely to jeopardize a species. And so to show, to allege a violation, you've got to focus on an action of the agency. I thought the action here was the guarantee which triggered the expenditure, which triggers the development, all of which triggers consultation. Well, I think if you look at the. That's how I understand the argument. Now, whether there's a causation problem still, isn't that an action that would fall potentially under the ESA? Well, if they were only focusing on actions and asking for relief with respect to particular actions, then they could do that. But the relief they're seeking is programmatic relief. They want consultation with regard to the whole course of these agencies' activity in the Sierra Vista area, and that's what's improper. I don't want to put words in their mouth, but I thought that I heard counsel say it could go either way, individual or programmatic, and that if you have, I interpret that to mean that if you have multiple loan guarantees, that in fact maybe it turns itself into a self-programmatic issue. But you are looking at each one of those and their downstream effects, so to speak. Well, plaintiffs could focus on multiple loan guarantees if they were injured by them, but they would have to, you know, focus on why those particular ones were out of compliance with the statute and ask for relief with respect to those. These plaintiffs aren't asking that those guarantees be set aside. They are saying the agencies should programmatically consult with regard to their whole range of behavior here. So I think there is a problem with the way that they have brought this suit. And I think that the Supreme Court got to that in part in its recent National Association of Home Builders case from about three years ago. There the challenge was to a particular agency action under the Endangered Species Act that was EPA's approval of Arizona's Clean Water Act permit program. But the plaintiffs said, well, look, that's just one action. It occurs in the context of other EPA behavior. EPA is also going to be funding some activities. It's also going to be overseeing Arizona's implementation. And the court said, no, you can't proceed that way. This is in footnote 11 of the Defenders of Wildlife Opinion. I think the court made clear you've got to proceed by focusing your case on particular agency action. But even if this is not programmatic, I think there are serious problems on both the causation and the discretion fronts here. With respect to causation, even if it is appropriate to lump all these programs together, the center introduced no evidence in response to summary judgment indicating that, you know, but for these loan guarantees, there wouldn't be the same amount of development. And these were, as Judge Reimer's questions brought up, there's got to be some sort of evidence that the situation would be any different if you didn't have these loan guarantees. Developers develop housing. They don't, there's no evidence that developers do that because of the VA loan guarantee program. And the plaintiffs have responded, well, the agencies say that their purpose is to support or promote development. Well, that's not correct. These programs are not programs to promote development. They are programs to assist certain individuals. They're benefit programs. Veterans earn the right to loan at a reasonable rate, at reasonable conditions, by reason of their service to the country. And they are guaranteed that. It's not, the purpose of that isn't to promote development of new housing. Same way with the HUD, Single Family Loan Guarantee Program. The purpose of that is to make sure that some money, private money, is going to lower income people. If there were no loan guarantee program, that doesn't mean the banks wouldn't be loaning out that money. It would simply be going to people who were of higher incomes or non-veterans. So there's just been no showing of a causal link here between these guarantees and the problem, which is the status of the aquifer and the river. Certainly, when a federal agency, such as the Army, running Fort Huachuca in this area, it is subject to these statutes because it's doing something that has a connection to the aquifer and to the river. It's pumping groundwater itself. It's housing, providing housing for its soldiers. But when a soldier decides to leave the Army and go out and buy a house with a VA loan, there's no causal link between what the VA is doing in that situation and the groundwater situation. So that's certainly one block to the statutes applying here. And I think, you know, this Court's cases in the Kamakani case, the Hawaii case, which is a NEPA case, indicates that, you know, when you have action, even if it take place, are made by non-federal actors, as was the case there. The fact that the federal government plays some tangential role in that case that provided some funds up front for studies, that's not enough to make it a federal action. Now, counsel mentioned the highway situation. Well, if the Federal Highway Administration is providing, you know, 90 percent of the money for a highway and has the ability to decide where interchanges are going to be, then there's a causal link between the decisions of the federal agency and the development, which can reasonably be seen to happen if you put in an interchange in a freeway. We don't have that kind of causal, reasonably close causal connection in this case. And then the final block to these statutes applying here is the lack of discretion of these agencies. And there doesn't have to be a prohibition in the statute. The statute doesn't have to prohibit considering endangered species. What this Court's cases have said is the question is whether the agencies have discretionary authority to take steps that would inure to the benefit of the species. Those are cases like the Sierra Club versus the Sierra Club versus Babbitt case involving the Bureau of Land Management's approval of a right-of-way through a federal forest, where the BLM simply didn't have the discretion to require the timber company to take steps to benefit endangered species. So here, these agencies don't have the statutory discretion to tell a veteran that, unlike anyone else who applies for this, for a mortgage in this area, that they have to undertake conditions to save water. These statutes just don't provide that sort of discretionary authority. These statutes are directed at just simply making sure that the lenders who give out the loans are can process how the. Your best case for that argument, that although it need not be some kind of a mandatory prohibition, that the nature of the agency and their statutes is such that they don't really have this authority. What's the best case on that point? I would certainly look at Marbled Murillette versus Babbitt, because there the Fish and Wildlife Service was playing a role with respect to timber harvesting. They were actually playing that role under another provision of the Endangered Species Act, but that Section 9 of the Act, but that Section 9 didn't give Fish and Wildlife Service the authority to do anything more than provide advice as to how to avoid a taking. So that would certainly be one. I think the National Association of Homebuilders from the Supreme Court is another that was. In that case, you have the peculiarity of their saying that, in effect, the corollary statute set kind of a floor and a ceiling, and so it didn't give you leeway. And so with this statute, we don't have that same kind of restriction that you did in Homebuilders, do we? This statute is not set up the same way, it's true, but I think the Supreme Court there was making a broader point than just under that statute. It's true that that statute set nine criteria, and if those were met, EPA had to approve it, but that was an example of an agency that lacked discretion. And the petitioners had argued in that case, well, the Endangered Species Act itself provides discretion, and the Court said, no, you've got to look at the whole statute and the situation the agency is in. But in cases like Sierra Club v. Babbitt, the road through the forest case, the Court simply looked to what discretion was available to the agency to assist the endangered species, and in none of those cases was the agency action in question so distant causally from the actual effect. And I think that affects the analysis as well. I see I'm out of time. Thank you very much. Okay. Thank you, Mr. Sheldon. Ms. Adams. Adams. Thank you. I'd like to try to address Mr. Sheldon's points in reverse order, if I could do, very quickly. The first point on the discretion issue, the agencies already use their discretion in ways that demonstrate that they could also do so for the Endangered Species Act. For example, the SBA has a regulation that requires that no loans be issued in the Coastal Barrier Resource System. That's a million-plus acres set aside on the Gulf and Atlantic and Great Lakes coasts that's set aside specifically for wildlife protection and to discourage development from taking place in that area. So the SBA has created a regulation that says we will not issue loan guarantees to businesses in land within this resource system specifically to comply with this other statute that's designed to protect wildlife. It's no different here. It's exactly what the agencies could do here. I'd also like to back up and address the point about the final agency action and whether or not these claims are barred by the National Wildlife Federation versus Lujan. To be clear, Lujan only applies to our NEPA claims, not to the ESA claims, because the NEPA claims are brought pursuant to the APA. And we challenged a series of specific final agency actions that are listed in the second amended complaint in the record between pages 84 and 88. Lujan was concerned with plaintiffs creating a program out of disparate elements, sort of a self-named program of disparate elements. Here we have a series of actions that while they go to different homes, different businesses, are essentially the same action with the same criteria taken over and over and over. And this court in the High Sierra Hikers versus Blackwell case explicitly said, when you challenge a series of the similar actions that are taken over and over and over, Lujan does not bar those claims. And finally, on the causation issue, the agencies, because they can set these conditions, because they can comply, they can change their eligibility criteria, they can affect the river. They can make changes to their own loan insurance guarantees that would have an effect on the river. And that's what NEPA and the ESA – I'm sorry, I've gone over my time. If I could just finish my sentence. That's what NEPA and ESA ask or require that the agencies do. Simply take a step back, decide whether or not they should do anything different, and then do it. And here the agencies have the authority, the ability to do so. Thank you. Okay. Counsel, thank you both for your helpful arguments. The matter just argued will be submitted.
judges: Hug, Rymer, McKeown